Thank you, Mr. Clark. Good afternoon. Please be seated. First case this afternoon is case number 4-170121. People v. Ross. For the appellant, we have David Manchin and for the appellee, Matthew Lee. Mr. Manchin, you may proceed. Thank you, Your Honor. May it please the court, counsel. This case involves a state appeal from a trial court order suppressing evidence. In this case, police officers had gotten a search warrant for a tan two-story house on the east side of North Greeley at the corner of North Greeley and East Chestnut. The problem arose as or after the search was already started. The street number listed on the warrant was 827 Greeley. The actual numbers of the house were 1002. The trial court suppressed all the evidence based solely upon that discrepancy between 827 and 1002. I submit that the trial court's determination was incorrect. The standard as far as sufficiency of the warrant for the description of the property is that it must be sufficient to allow a reasonable officer to determine with reasonable certainty which property is intended to be searched. In this case, we have a physical description of the property that matched one and only one building in this particular vicinity. The officers that conducted the search were the ones that also developed the probable cause for the search. Namely, they had driven past this particular building and smelled a very evident smell of marijuana coming from it on the day of the search. So the officers had no questions in their mind regarding which building was intended to be searched and the description of the property in the warrant and in the body of the warrant clearly established that the building intended to be searched was the tan two-story house in the corner of Greeley and Chestnut. Counsel, you started out your argument indicating that either at the time of or right after they realized the house number or whatever was different, was there any obligation to pull back and consult with the trial court who issued the warrant at that point? The testimony of the one officer was that he was on one side of the building and the other officers were on the other. At the time he noticed that the numbers of the building were 1,002, he heard the other officers on the other side of the building saying police officers, warrants, and talk. Come out, step out or something like that. So the search had already started and they may have already been talking to the individuals in the house at the time the 1,002 was discovered. So by the time the discrepancy between 827 and 1,002 was discovered, it was already too late because everything was already in motion. They were already knocking on the doors and talking to the individuals inside. At that point it is simply too late to try to stop the proceedings and call a judge and say, hey, the warrant says 827, the numbers in the house are actually 1,002. Well, it seemed to me it wouldn't be too late until contraband was discovered. That's when it would be too late. Right? Yeah. Well, and no contraband had been discovered. As far as this record shows, there's no contraband discovered because there's no testimony from the officers conducting the search as to whether they saw something when the doors opened or anything like that. There's no testimony regarding how the search was conducted because this was all thrown out based solely upon the discrepancy between 827 and 1,002. And this type of discrepancy is not sufficient to throw out this warrant or to say that the police officers were not acting in good faith reliance upon a warrant, which was valid on its face that there was no – and the trial court found that the officers had no knowledge of the discrepancy before the search was started. How significant is it that the officers who developed the warrant and executed the warrant knew what house everyone was talking about, what house was going to be searched? I think that it's quite significant. In some of the cases cited in my brief, the courts point to the fact that the officers conducting the search were also the ones that knew about the property and had requested a search warrant, saying that since they know which property is to be searched, that there is no confusion in their minds created by the technical irregularity in the warrant. I believe it was Luckett, which is cited in pages 24 and 25 of my brief, the police officers went to a premises. After they got there, they discovered that there were actually two apartments on the floor to be searched, and that information was not known to them before the search, and the court said that the address was adequate. And since only the target apartment was actually searched, the discrepancy between one and two apartments was that the discrepancy did not require throwing out the warrant. I think there was one other case that was similar to that, where they discovered that the, well in Watson, they listed the address as 2300, and it was actually 2310, and the court said there that the description was sufficient because of the physical description of the property, and because the officers conducting the search were the ones that had applied for the warrants. So I think it is significant that the officers knew the intended property. The property was properly described, accurately described, and described only one building in this entire area as a two-story house with barn and outbuildings at the corner of Greeley and Chestnut. That this, the premises search, is the only house in this vicinity that matches that physical description. So to throw out everything just because they listed the number on the house wrong, I think is incorrect. That a misdescription of the house address is not per se grounds for throwing out the search. I think this, in this case, the police officers were acting in a reasonable, good faith reliance upon a warrant that was valid on his face. The problem in the warrant was not discovered until the search was started or in progress. And at that point in time, the law is clear that evidence found after, discovered after the warrant is issued is not grounds to throw out the warrants. And that's what we have here is evidence discovered after these sorts of warrants, namely the evidence that the building has 1002 rather than 827. This is not a case, in their brief, the defendant has suggested that the officers knew before they went there about the discrepancy in the address. The trial court expressly found that the discrepancy was not known at the time the warrant was found. It was not known until the search was in progress. The officer also testified, the officer that applied for the warrant said he talked to the two officers in the field who told him that they had smelled marijuana at this location. He checked the online tax records official website, which showed this property as 827, which is why he included the 827 in the application for the warrant. After the search was over, he went back to the records and went to the courthouse to try to find out the basis for the discrepancy between 827 and 1002. And that's when further evidence or further information was developed disclosing that this particular property has one or two addresses, depending on which particular document you look at. And some of them, they describe it by both addresses. So this is not a case where the police officers knew beforehand that the warrant was invalid or that they had included the wrong information in the search warrant. So I submit that either based upon the validity of the warrant itself or upon the officer's good faith reliance upon the warrant, the trial court suppression order should be reversed. So the trial court found the search warrant was ambiguous. Is that expression now allowing the motion to suppress? He based it upon the discrepancy in the number on the house, and that was it. That was the only discrepancy he found. He said that in a large metropolitan area, police officers in this situation might have called, but since these officers were in a small department that knew that this was the building to be searched, they didn't bother to make the call. It is one of the references he makes in his ruling, comparing this to saying that, in effect, the trial court is just saying the police officers were sloppy here, and because they were sloppy, I'm going to suppress everything. And I submit that is not the standard here. The information included in the warrant, on the face of the warrant, was based upon the information they had at the time of the application. The information they had at the time of the application, based on the tax website, was that this particular property at this particular corner was 827 Greeley. Based upon that, they got the warrant, they get there, and as the search starts, they discover the number 1002. And I submit that discrepancy is not sufficient to require suppression in this case, given the physical description of the building that matches only one particular building in the area, and where the officers knew that this was the intended property to be searched, because they were the ones that developed the information. That any, quote, unquote, sloppiness on the part of the officers is just not sufficient to require suppression of the evidence in this particular case. Okay, thank you. You will have rebuttal. Mr. Lee, as you're approaching the podium, when I noted that this was case number 417-0121, People v. Ross, I should have also indicated that it's consolidated with People v. Schrieffer as 417-0122, so I make that clarification for the record. You may proceed. Thank you, Your Honor. May I please report, counsel? Your Honor, I'm going to spend the majority of my time attempting to address arguments that counsel brought up this afternoon, since you've already read the briefs. First off, I believe the first question from Your Honor was regarding whether or not there would have been an obligation by the police officers, upon discovering the discrepancy in the search warrant, to, so to speak, pull back and check with the judge who issued the warrant. And Justice Turner already indicated that there was no contraband found at the time. I also just want to point out, Your Honors, that the case law, specifically the Rubina case, points out that this question about whether or not it would have been too late, and that would have been the words of counsel over here, to pull back because essentially the search warrant had already been in effect. That's the State's burden, to establish that there were exigent circumstances that would require that a warrantless search proceed. And when we say exigent circumstances, the Rubina case specifically states that merely because there's the possibility that evidence, even drugs, can be destroyed, is not enough. They have to show that there was some evidence that they had a reasonable belief that that was going to happen. And in this case, certainly, we don't have anything like that. We have testimony from Sergeant Russell that he observed the discrepancy, the 1002 on the front of the house, as the officers were saying, police, police, get out. They're knocking and announcing, which suggests that they're still standing outside if they're telling someone to get out. So, again, we don't even have evidence that they were inside the house yet, much less in the middle of searching a house where apparently they found evidence contraband on the first floor, in the basement, on the second floor, that led to over 100 plants being located. So is there any evidence that these plants could have been destroyed, flushed down the toilet? Not at all, Your Honors. So I would suggest, again, that the notion that it was, quote-unquote, too late, when we have an officer who admitted that he had a radio that he could have used to say, gentlemen, we've got a problem here, let's call someone. And I would also point out that one of the cases cited by the state, the Powles case, was one in which that's precisely what the police did. They observed an infirmity in the warrant, and they said, let's go ahead and call the state's attorney, see what they want to do, and the judge then determined, well, I think that you're close enough, you can proceed. And that's the way it ought to be, because the way that the Fourth Amendment protection against unreasonable searches and seizures works is that it's not the police officer's judgment call to determine, you know what, it's good enough, we're fine. It's up to the neutral and detached magistrate to make that decision, not the officer who has an agenda to get the bad guys, necessarily so. So that's the first thing I wanted to point out. The other thing that was mentioned, I think, at a couple of different points by counsel, is that the discrepancy between what was on the warrant and what was actually the address was not sufficient, that it was just a minor discrepancy. I would, first of all, suggest that the discrepancy in this case so far is more egregious than literally all of the cases in which the state mentioned or cited in their brief. All the other cases where I would suggest more minor discrepancies, for instance, in the Luckett case, they didn't even realize that there was a problem until they already kicked down the door and realized that there were actually two apartments on the first floor. So there's no way they could have even known that there was a discrepancy until they already made a breach. Whereas in this case, the 1002 is in plain sight for all to see, standing in the street, without the use of any technological advances or special police equipment. Anyone would have known that the address on this house was 1002. In the Powellist case, it was the correct address number, it was the wrong street name, but the name that was on the address, or I'm sorry, on the warrant, was a non-existent address. So it's pretty clear that the police could have figured out, well, this isn't even a real address. Let's go to the one that we can find. In Reynolds and McCarty, again, it was the fourth trailer down the road instead of the third. So that, I would say, suggests a more minor discrepancy. In Kilfoy, it was the correct street address, but the wrong city. But there was no way that it could have been Crystal Lake because that was 45 miles away. And so on and so forth, Your Honors. My point is that we have a situation here where the Detective Russell, in his sworn affidavit, indicated that there would be a house that we're going to search that has the numbers 817 affixed to the front. That is literally the language that's in there. It's not just that the address is 817 North Greeley. It's that you're going to see the numbers 817 on the front of the house, and at no point in the record does it show that there was ever a house in the vicinity that had the numbers 817 on the front. In fact, not only is the real address 1002 East Chestnut, but 817 North Greeley is the actual address of the house that is directly adjacent to it, which also happens to be a two-story, single-family residence. So to suggest that this was an abundantly clear situation where any officer could have known what was going on, I think, is not correct. It's not accurate. I also want to – Counsel, it's not that any officer would have known, but you have a situation where you have the same officers who developed the information to obtain the warrant, actually serving the warrant, and it does seem that they were abundantly clear on where they were going and where they were supposed to search. That is true, Your Honor. But I would also point out that in the Rabina case, which I think is the case that is most analogous to the present case, that was another situation where Sergeant Thomas, who was the lead detective in that situation, knew exactly which house he needed to search. It was the apartment on the second floor to the left, even though that the apartment was incorrectly listed as C and it should have been D. Now, what happened was the officers that actually went to execute the warrant – So you have different officers. We do, but at the end of the day, it's still the officer who was in charge of the investigation who makes the judgment call and says, I know exactly which house we need to search. It's the one on the left. Go ahead and search anyways. And it's the same situation here where Sergeant Russell is the one in charge. He's the one who saw the infirmity in the warrant and he decided, I don't have to call my guys out because I know which house we need to search. And he made that judgment call. And again, at the end of the day, when you look at Rabina, it's not about that, Your Honor. It's about the fact that when there is an infirmity discovered prior to the execution of the warrant, it's incumbent upon the police to let the neutral and detached magistrate handle the business of deciding, yeah, you can go ahead and do that. So really, the fact that – and frankly, they got the right house, right? In every single one of these situations, they get the right house. Otherwise, there wouldn't be a court case because there's no evidence. But again, in Rabina, he was right. Well, they didn't get this house by chance. The search warrant, the complaint affidavit for search warrant, identifies a single-family, tan, two-story dwelling located on the east side of North Greeley Street with a detached barn to the north of it. So how many other such tan, two-story homes on the east side of North Greeley Street with a barn to the north of it were there? Well, really, I would suggest this, Your Honor, and that point is well taken. Certainly, if you're going to interpret the single-family residence to the north as a barn, which it was not, then I suppose you could make that conclusion. It just says a detached barn to the north. Right. So were there any other structures that fit the description that was set forth in the complaint affidavit? Well, what I can tell you is that in this quadrant, there would have been four homes, the target residence, the residence to the north, which officers basically informally called a barn because of its shape, even though Officer Russell knew that it had been a residence the last time he went inside that house, and that's certainly plainly evident in the record. There's the high-slope residence, which is to the right of 817 North Greeley, the barn, so to speak. And finally, the Pittman residence, which is to the south and roughly to the east of Tan, two-story East Chestnut. And I think, again, it's problematic that we have a search warrant that describes the 817 on the outside of the house primarily displayed according to the face of the warrant when there isn't even a single house that is. The inclusion of the barn in the complaint's affidavit for search warrant is significant to me in that it helps identify the residence which is previously referred to because it identifies the single family Tan two-story dwelling that has a detached barn to the north of it. So it helps identify by location where that Tan two-story dwelling is. Isn't that what that says? It is, Your Honor. But, again, I think that when you look at the way in which this investigation unfolded also I think is problematic because even the way in which the police determined that the target residence was going to be Tan two-story East Chestnut involves police saying that they allegedly smelled the odor of cannabis coming from Tan two-story East Chestnut. And we made it clear on the record during testimony that did you end up going to the east of Tan two-story East Chestnut since you're saying that the wind was blowing in a southwesterly direction to allow you to make that determination that there was an odor to rule out any other houses that could have been the sources of that cannabis odor. And he said no. Did Deputy Ernst? No, we did not. And it turns out that upon further examination, Sheriff's Haunt is high school acquaintances with the people that live to the east of Tan two-story East Chestnut and the people who live to the northeast of Tan two-story East Chestnut. So the other thing that is brought up by the state that we haven't really addressed it is this whole good faith exception doctrine. And one of the reasons why this good faith doctrine does not apply in this case, well, there's two of them. The first one being that one of the exceptions that the fourth district noted in the Taylor case, I believe it is, is that is when the issuing judge was misled by information provided by the affiant, when the affiant either knew or should have known that the information was false because of a reckless disregard for the truth. And frankly, the trial judge all over his ruling, both at the motion to suppress as well as the motion to reconsider, emphasized that he believed that the officers were being reckless in their disregard for the truth because the truth is that all they had to do, any one of those officers, is literally take their eyes and look at the front of the house to determine that the address was Tan two-story East Chestnut on a house that's facing Chestnut. The front is facing Chestnut. And there's numbers 1002 right there. And none of them did that. And there's this whole business with the cannabis where they just assume that the order has to be coming from this house because the sheriff knows the other people. And there's no way that people reporting suspicious behavior could possibly on their own be growing cannabis. And so that essentially is part of this whole narrative that kind of litters the entire situation here. In fact, I just want to also point out that paragraph three of the affidavit involving the water bills and utilities, Sergeant Russell admitted that that information actually pertains to 817 North Greeley, which is the home to the north of 1002 East Chestnut, meaning that the issuing judge was provided incorrect information that he had to at least partially rely upon to grant the warrant in the first place. And the only reason why the police ended up putting that incorrect information on there is because they didn't bother to literally use their eyeballs to look at the front of the house, which would have immediately ruled out that that house was 817 North Greeley. So I think there's so much more to the story in terms of why it is that the trial judge ended up ruling in the fashion that he did. It isn't simply that he was fixating upon the numbers. There was a lot more to it than that. But to continue, I have a couple more points that I wanted to touch base on. And just while I have time, this wasn't really addressed by the State, but there's this other preliminary issue of standing that is indicated in the State's brief, and that relates only to Defendant Schrieffer. And so I want to point out that certainly I think the case law is well settled that it would have been proper for the State at the trial level to challenge or to raise the issue of standing at the motion to reconsider, even though they didn't raise it at the motion to suppress. And that ended up being the reason why the trial judge essentially rejected that objection by the State. But I also want to point out that at the hearing on the motion to reconsider, the counsel for Mr. Schrieffer at the time requested leave to present evidence by way of his client's testimony to establish standing at the motion to reconsider. And the trial judge at the time said that, well, since I'm denying the State's request or I'm denying the State an opportunity to object to standing at this time because they didn't raise it at the motion to suppress, I'm going to also deny you the opportunity to present evidence. And that was made pretty clear. You know, Mr. Bruno at the time made a couple different requests to ask for leave to have his client testify briefly as to standing. And so my thought is that, Your Honors, certainly if it were to be sent down and remanded just on the issue of standing, we know that hopefully Mr. Schrieffer would be given the opportunity to testify as to standing because he certainly tried to do so at the trial level but was prevented from doing that. But I think also the Court has before it information by way of our motion to supplement, which shows that at the preliminary hearing the State actually elicited evidence regarding standing. In fact, it was actually Sergeant Russell himself who testified at the preliminary hearing. A couple different things. He said that, number one, that Ryan Schrieffer was part of this LLC that owned the home that was in question. And secondly, that Mr. Schrieffer had actually taken rent from the co-defendant, Mr. Ross, and allowed him to have access to the home. And certainly those are two factors that the Court should consider when asking whether or not someone is standing. Do they have a possessory interest? And do they have the ability to grant or prevent access from others? So I guess the point – May I ask for clarification as to your position on standing? Are you saying that you're acknowledging that it was error on the part of the trial court to deny the State the ability to raise the issue in its motion to reconsider? I believe that the case law indicates that it was proper. It would have been appropriate or permissible for the State, yes, Your Honor, to raise the issue of standing even after the fact at the motion to reconsider. Isn't it discretionary? Not based on the case law that I see, but I hope I'm wrong and I hope you're right, frankly. But what I'm trying to raise, Your Honor, is that at the end of the day, I believe that it really amounts to nothing more than a harmless error because we know that Mr. Schrieffer does have standing, even just based on the record that's – the part of the record on appeal. Now, the State has cited a couple of cases which suggest that it's not appropriate for the court to consider the prelim hearing testimony because it wasn't made part of the trial record. But first of all, I think we can distinguish because in that situation, we're talking about the defendant trying to bring in testimony from the witness at the prelim hearing that was meant to contradict that same witness's testimony at the trial to make it seem like they were being inconsistent. Here we have what would be uncontroverted evidence that the State itself produced at a prelim hearing in order to not only provide standing, but really satisfy its theory of the case, which is that Mr. Schrieffer is an accomplice based on accountability. And so for them to even be able to charge my client with these offenses, they had to establish standing. And then in the next breath, they're saying, well, wait a minute, you don't have standing to challenge. So at the end of the day, Your Honors, I would suggest that in terms of the interest of justice, would it be anything more than just kind of a legal exercise to send it back down only for Mr. Schrieffer to have to essentially ask the court to take judicial notice of the transcript from the prelim hearing, which would clearly establish that he has standing to challenge the validity of the search. And, Your Honors, I think I'll just conclude my time by simply reiterating that in our view, the Urbina case really does control here. The vast majority of the cases that are cited by the state have nothing to do with and have no relationship to what happens when the police actually discover a defect in the warrant. All the other cases, the Watson case, the McCarty and Reynolds and Kilfoy, all of those have to do with situations where the police never even knew there was a problem with the warrant until after the fact. But in Urbina, we see a very analogous situation where the police had an opportunity to do the right thing and contact the neutral and detached magistrate, and they didn't do that in this case. I also want to point out that the Luckett case that is cited by the state is distinguishable, very easily distinguishable from this case because in Luckett, again, there was no way that the police could have even known that there was a problem until they already breached the first apartment. In this case, the problem with the warrant was readily available in appearance to anybody who would have been standing in front of the house. And I want to also just point out finally that the Palos case is instructed because the police did do the right thing. They stopped the proceedings. They contacted the judge, and the judge essentially said, you can proceed forth. And that easily could have been the case in this situation, but that's not what the police chose to do, and I think that's where they failed. Thank you, Your Honor. Thank you. Any rebuttal? Yes, Your Honor. Okay. Your Honor, neither Palos nor Urbina create an obligation on the police officers to make a phone call to the court when they discover a discrepancy. In Palos, the officers did make the phone call and did get the information back, but the fact that they made the phone call was not a basis for the appellate court's decision saying that the search warrant was valid or the search warrant was valid. That was just evidence in there but was not relied upon by the court as saying, okay, because you asked, the search warrant is valid. It was mentioned but was not a basis for the decision saying that you have to make such a phone call before you can make a search. And in Urbina, the police officers that were conducting the search discovered the discrepancy between the C and the D. Before they made the search, they didn't know which place to search, so they called the police officer that had provided the information for the warrant. The informant had told that officer that the drugs were being sold from apartment D. The officer believed that the drugs were being sold from the apartment at the left, which was at the right-hand side of the stairs. The officer believed that the drugs were being sold from the office at the left top of the stairs based upon information that there was somebody acting as a lookout. The officers called this guy and he says, go ahead and search. The police calls the other officer who provided the information and he says, search C. It was under those circumstances where the officers conducting the search were not certain themselves which place to search. That it was improper to search the apartment C because the court found that the information relied upon to say that the sale took place on the left side of the stairs was not sufficient or invalid. That where the informant states apartment D, that is where the probable cause is located. That is completely different than this particular situation where the officers were the ones that developed the information. We're told to go, as Justice Harris noted, they were told to go to a tan house, tan two-story house in the corner of North Bridge that has a barn to the north of it. The testimony and evidence here was that of the four residences or premises in this vicinity, the only place that matched this description was the building that was searched. And I submit that under these circumstances the trial court suppression order was incorrect. That the description of the property was valid. The discrepancy was not discovered prior to the search but was discovered at the time the search was started. And it had taken two and a half hours for the officer to get the search warrant. After having knocked on the door to say that the police officers are now going to have to wait another two hours to be able to get a hold of the judge to say, hey yeah, go ahead and search 1002 even though the warrant says 827. I submit that that is unreasonable. That the police officers were acting in reasonable good faith on a warrant that gave a very accurate physical description and locational description. The only error in the warrant was 817 versus 1002 and that information was not known at the time the warrant was requested and was not discovered until after the warrant was issued and after the police were already in the process of serving the warrant. So I submit that the trial court was incorrect in its determination either based upon the face of the warrant or upon the police officer's reasonable reliance or good faith reliance upon that warrant. Okay. Thanks to both of you. The case is submitted and the court stands in recess.